UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

Raymond Stubbs,

                Petitioner,

                                                              **Hon. Hugh B. Scott**
                                                                   02CV063
v.                                                               Consent

                                                                  Decision & Order

Victor Herbert, Warden,
Attica Correctional Facility,

                Respondent.
_____

       The petitioner, Raymond Stubbs ("Stubbs"), seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 challenging his state court conviction.

## Background

       On April 17, 1995, following a jury trial in the Monroe County Court, Stubbs was convicted of four counts of intentional murder, one count of first degree assault, and one count of attempted murder in the second degree. He was sentenced to 63⅓ to life imprisonment.

       More specifically, Stubbs, was convicted of participating in the execution-style murders of two people in their home on Finch Street in the City of Rochester. Named as co-defendants and tried jointly with Stubbs, were Timothy Muldrow and Anthony McGee. Another defendant, Thearthur Grimes was tried (and convicted) separately because he confessed to the police and

1

implicated the others. The prosecution alleged that the motive for the killings was to eliminate witnesses to a prior murder committed by Jerold Usher, an associate of Stubbs.

The theory presented at trial was that on December 23, 1993, Jerold Usher shot and killed Darryl Johnson in a house located at 71 Locust Street in Rochester. Earlier that day Johnson had thrown Usher out of the house because he learned that Usher intended to sell drugs from that location. Johnson's niece, Myra Woods, and her six children lived in the house. Following his expulsion, Usher allegedly returned to the house with a gun and shot Johnson twice. Usher fled to David Crutcher's apartment at 250 Birr Street, where Usher, Stubbs , McGee and Grimes operated a drug house (R. 1267-1269).[1] When he entered the apartment, Usher went straight to the bathroom and threw up. McGee told Crutcher that Usher had killed someone on Locust Street and then directed Stubbs to find out whether there were any witnesses to the murder (R. 1288-1290).

According to Crutcher's trial testimony, on December 28, 1993, Stubbs showed Crutcher four guns in a bedroom at 250 Birr Street and said, "[T]his is what we're going to use tonight" (R. 1302). At the request of McGee, Crutcher, who was under the impression that McGee and his cohorts were going to kidnap the witnesses to the Johnson murder, had procured a stolen red Ford Probe for the group to use as transportation in the crime. Later that day, at about 11:00 p.m., Crutcher was inside his apartment with defendant, McGee, Muldrow, Grimes and a man known as "Smiley" (R. 1305). Armed with the guns that Stubbs displayed earlier, four of the men

---

[1] References denoted as "(R. __)" refer to the transcript of the state court proceedings. The state court record in this case has three (3) volumes. The page numbers in Volumes I and II are consecutive, Volume II starting at page 860. The page numbers in Volume III are numbered starting at page 1. Thus, references to pages in Volumes I and II will list only the page number; references to information in Volume IIII will be denoted as "(R. Volume III, __)".

(Stubbs, McGee, Muldrow and Grimes) left the apartment and drove away in a stolen car obtained by Crutcher (R. 1314).[2]

That same night, Deborah Ibezime was at her home located at 2½ Finch Street with her boyfriend, Darryl Gross, and her two sons, Jerry Brock, age 14, and Darryl Gross, Jr., an infant. Shortly after midnight, someone knocked on the front door.  Testifying at the trial in this matter, Brock stated that when he opened the door, Stubbs, whom Brock knew by the nickname of "Raider," entered the house and began speaking with Ibezime, who was lying on a sofa in the living room (R. 765-767). Brock made an in court identification of Stubbs as the person he knew as "Raider" and who had entered the house on the night in question. Id.  Brock overheard Stubbs and Ibezime talking about a murder that occurred on Locust Street, and Stubbs asked Ibezime who was present at the time of the shooting (R. 770-771) . After Ibezime indicated that she had seen the victim Darryl Johnson arguing with the person who shot him, Stubbs left the house.  As Stubbs walked out the front door, he passed Janice Cartledge, who was approaching the house to visit Ibezime (R. 1056-1057).

---

[2] Crutcher was a key witness for the prosecution.  He was deemed to be an accomplice as a matter of law for his role in procuring the car allegedly used by defendants in their commission of the crimes.  Crutcher testified that he was in the apartment on December 23, 1993 when Usher said that he killed a man on Locust Street, and that he heard McGee and the others planning to eliminate witnesses to that murder. According to Crutcher, at about 11:00 p.m. on December 28, 1993, Stubbs, McGee, Muldrow and Grimes left the apartment for Finch Street in search of witnesses to the Locust Street murder. The men were armed with the guns that defendant showed him earlier in the evening (R. 1308). Crutcher testified that about 45 minutes later, Stubbs returned to the apartment by himself and acted in a very emotional manner. (R. 1315 - l3l8). Stubbs waived a gun around and asked if McGee, Mu1drow and Grimes  had called. Defendant also demanded that Crutcher; play video games with him. When he saw the police outside, defendant began looking for a place to hide his gun. Crutcher testified that he hid the weapon for Stubbs in the back of a television set, and that Stubbs then jumped in bed with his girlfriend and acted as if he were asleep (R. 1322).

About two minutes after Cartledge arrived, Stubbs returned to the house and knocked on the door. When Darryl Gross opened the door, Stubbs said that he forgot his keys (R. 775). Ibezime and Gross told Stubbs that he did not have any keys when he entered the first time, but Stubbs nevertheless went into the living room as if to look for his keys.  Seconds later, while the front door was still open, three men burst into the house wielding guns (R. 1062). The three men, who were wearing black hats and whose faces were partially concealed by their clothing, ordered the occupants, including defendant, to sit or lay down on the floor. Two of the intruders then grabbed Ibezime off the couch and took her to the dining room, while the other pushed Gross into the kitchen and sat him down on a stool (R. 1066-1067). The three gunmen told Stubbs to leave the house.  Stubbs did not leave the house, but instead walked toward the door and stood in the dining room, where one of the gunmen was hollering questions at Ibezime and hitting her with his gun (R. 782-784, 1068). The two gunmen in the dining room suddenly opened fire, on Ibezime, shooting her in the back with eight bullets. They then ran out the front door, followed by Stubbs. The third gunman, still in the kitchen, then shot Gross in the head. As he passed Cartledge on his way out of the house, this gunman shot Cartledge in the face.[3]

At trial, Brock testified that he witnessed these events while holding his nine-month old brother on his lap. After the gunmen left the house, Brock put his brother on the sofa and ran outside for help.  Brock testified that while running toward a friend's house to call the police, Brock saw Stubbs standing on the corner of Finch and Ravine Streets with the three men who had just left his house (R. 792-793).

When the police arrived on the scene, Brock informed them that four armed men, one of

---

[3]  Cartledge survived the shooting and testified at trial. (R. 1054).

whom was named "Raider," entered his house and killed his mother and stepfather. (R. 9) The police therefore determined that Stubbs could be found at the apartment he shared with Crutcher on Birr Street. Upon arriving at that address, one of the officers noticed blood on the handrail leading to the back door. Using a bull horn, the officers directed the occupants to come out with their hands up. Eventually, after repeated announcements, four people came out of the apartment: Stubbs, Crutcher, an adult female (Zelda Williams) and a small child. (R. 20). Stubbs and Crutcher were taken to police headquarters for questioning. During questioning, Stubbs allegedly admitted to Investigator Terry Sheridan that his nickname was "Raider" and that he was in the house on Finch Street when the shooting occurred. He also claimed, however, that he "didn't know what was going on." and that "Ant", "Freddy G." and "Tim" were "the three guys you're looking for." These statements were suppressed and were not introduced at trial. The following day, December 30, 1993, officers searched Muldrow's apartment based upon the consent of his brother and found various guns, as well as cocaine and money. Later that evening, Muldrow was spotted driving in a car. The police stopped the car and, following a foot chase, took Muldrow into custody. Muldrow denied participation in the murders but admitted that the guns found in his apartment by the police belonged to him. McGee was arrested on January 24, 1994. When arrested, McGee was carrying a .380 caliber handgun that was later determined to have been used by Jerald Usher to kill Darryl Johnson on Locust Street. The fourth and final participant in the Finch Street murders, Grimes, was arrested on February 4, 1994 in Houston, Texas. Grimes admitted to the police that he was in the house on Finch Street with a gun but claimed that McGee and Muldrow did the shooting. Grimes' statement also implicated Stubbs. According to Grimes, he, McGee and Muldrow initially waited outside the house while Stubbs

entered the house. Stubbs came back outside, told the others who was inside and then returned to the house and pretended that he forgot his keys.  According to Grimes, immediately thereafter, Grimes, McGee and Muldrow burst through the front door.  (Docket No. 6, Exhibit D).

On April 17, 1995, after a jury trial, Stubbs was convicted of four counts of murder in the second degree,[4] attempted murder in the second degree and assault in the first degree. McGee was found  not guilty on all charges, Muldrow was convicted of two counts of murder in the second degree pursuant to §125.25(3), but not guilty of all other counts.  Stubbs' appeal to the Appellate Division Fourth Department which affirmed the conviction on June 16, 2000.

On September 20, 2000, the New York State Court of Appeals denied leave to appeal to the Court of Appeals. The petitioner now seeks federal habeas corpus relief on two grounds: (1) that he was denied effective assistance of counsel because trial counsel failed to specifically object to the verdict as being repugnant; and (2) that he was denied effective assistance of appellate counsel because appellate counsel failed to argue that trial counsel was ineffective for failing to object to a repugnant verdict. (Docket No. 1 at page 9).

**Exhaustion**

Keeping with the requirements of 28 U.S.C. § 2254(b), federal courts will not consider a constitutional challenge that has not been "fairly presented" to the state courts. See Ayala v. Speckard, 89 F. 3d 91 (2d Cir. 1996), citing Picard v. Connor, 404 U.S. 27, 275, 92 S.Ct. 509,

---

[4]   Two counts pursuant to §125.25(1) of the New York State Penal Law [with the intent to cause the death of another person, he causes the death of such person ...]  and two counts pursuant to §125.25(3) [acting alone or with others, he commits or attempts to commit ... burglary and in the furtherance of such crime he or another participant causes the death of a person ... .].

512, 30 L.Ed 2d 438 (1971); Daye v. Attorney General of New York, 696 F.2d 186,191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984). A state prisoner seeking federal habeas corpus review of his conviction must first exhaust his available state court remedies with respect to issues raised in the federal habeas corpus petition. Rose v. Lundy, 455 U.S. 509 (1982) In order to meet this requirement the petitioner must have raised the question in a state court challenge to his conviction and put the state appellate court on notice that a federal constitutional claim was at issue. See Grady v. LeFerve, 846 F.2d 862, 864 (2d Cir. 1988); Petrucelli v. Coombe, 735 F. 2d 684, 688-89 (2d Cir. 1984). Finally, pursuant to §2254(b)(2), the Court has discretion to *deny* (but not to grant) an application for a writ of habeas corpus on the merits, notwithstanding the failure of the applicant to exhaust state court remedies.

The Respondent here does not contest whether Petitioner has exhausted his state court remedies. Based on the record before the Court, the Petitioner appears to have exhausted his state court remedies and therefore review of the claims asserted in this Petition is appropriate.

**Standard of Review**

State court findings of "historical facts," and any inferences drawn from those facts, are entitled to a presumption of correctness. Matusiak v. Kelly, 786 F. 2d 536, 543 (2d Cir.), cert. denied, 479 U.S. 805 (1986). (See also 28 U.S.C. §2254(e)(1) which states that, "a determination of factual issue made by a State court shall be presumed to be correct".) Where the State court has reviewed an issue on the merits, in order for a Petitioner to prevail in a federal habeas corpus claim, that Petitioner must show that there was a violation of 2254(d). Section 2254(d), as

amended by the *Antiterrorism and Effective Death Penalty Act of 1996* [5] ("AEDPA"), provides that a habeas corpus petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. The presumption of correctness attaches to both by state and trial courts and by state appellate courts. Smith v. Sullivan, 1988 WL 156668 (W.D.N.Y. 1998) (Larimer, C.J.) Nevius v. Sumner, 852 F.2d 463, 469 (9th Cir. 1988), cert. denied, 490 U.S. 1059 (1989).

AEDPA "requires federal courts 'to give greater deference to the determinations made by state courts than they required to do under the previous law." Ford v. Ahitow, 104 F. 3d 926, 936 (7th Cir. 1997) (quoting Emerson v. Gramley, 91 F.3d 898, 900 (7th Cir. 1996)cert denied., 520 U.S. 1122, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997)); see also Houchin v. Zavaras, 107 F.3d 1465, 1470 (10th Cir. 1997) ("AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal conclusion").

As stated by the Supreme Court:

---

[5] Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No.104-132, 110 Stat. 1214

> Sec. 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court…Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of law or if the state court decided a case differently than this Court has on a set of materially indistinguishable facts.
>
> Under the "unreasonable application" clause, a federal habeas court may grant a writ if the state identifies the correct governing legal principle from this Court's decision's but unreasonably applies that principle to the facts of the prisoner's case. See <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495 (2000).

**Ineffective Assistance of Counsel / Repugnant Verdict**

To establish a claim of deprivation of the effective assistance of counsel, the record must show "that counsel's representation fell below an objective standard of reasonableness." <u>Strickland v Washington</u>, 466 U.S. 688, 688 (1984). Moreover the record must show that the petitioner was prejudiced in such a manner "that there is a reasonable probability that, "but for" counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A claim of ineffective assistance of appellate counsel is reviewed under the same Strickland standard as is used in a claim of ineffective assistance of trial counsel. In addition, it is undisputed that an appellate attorney need not raise every non-frivolous legal argument on appeal which the trial record supports. See Evitts v. Lucey, 469 U.S. 387 (1985); Jones v. Barnes, 463 U.S. 745 (1983).

In the instant case, the petitioner asserts that trial counsel and appeallate counsel were ineffective for failing to raise and pursue a claim that Stubbs' conviction was repugnant because

McGee was acquitted of all charges, and Muldrow was only convicted of two counts of second degree murder.  Under New York law, "whether verdicts are repugnant or inconsistent ... is determined by examining the charge to see the essential elements of each count, as described by the trial court, and determining whether the jury's findings on those elements can be reconciled." Sweet v. Bennett,  353 F.3d 135, 143 (2d. Cir. 2003) quoting People v. Loughlin, 76 N.Y.2d 804 (1990).

Here, the record reflects that each defendant was charged separately.  The jury was advised that it was required to make separate determinations as to each defendant. (R. Volume III at 688). The charges against each of the defendants were not interdependent. The Court notes that the fact that McGee was acquitted of all charges represents a finding that the prosecution was unable, in the jury's view, to prove each and every element of the charges against him.  The fact that the jury may have determined that the prosecution did not prove, beyond a reasonable doubt, that McGee was sufficiently identified as the individual who took part in the killings, does not require a finding that the elements of the charges against Stubbs were not satisfied. The record reflects that the evidence of Stubbs' role in the Finch street murders, including the testimony of Brock and Crutcher, is overwhelming. The prosecution was not required to be able to convict each of the other participants in the crime to properly convict Stubbs.

Two of the four second degree murder counts alleged that Stubbs committed "felony murder" pursuant to §125.25(3) of the New York State Penal Law.  That section of the penal law applies to situations where an individual is killed by someone while in the commission of certain enumerated felonies.  In this instance, it was charged that the Finch Street killings took place during a burglary. A burglary takes place when a person knowingly enters or remains unlawfully

in a building with intent to commit a crime therein. New York State Penal Law §140.20.  Stubbs argues that the prosecution failed to establish what crime was intended to be committed. The evidence in the record included testimony from Crutcher to the effect that he thought that Stubbs and the others were going to Finch Street to kidnap the witness to the Locust Street murder.  The jury may have inferred from Brock's testimony that Stubbs and the others intended to menace, harrass or assault Ibezime.   However, under New York law, the prosecution "need not establish what particular crime the intruder intended to commit" to prove burglary. People v. Mackey,  49 N.Y.2d 274, 279 (N.Y. 1980). Rather, the State need prove only a general criminal intent, which may be inferred from the circumstances of the break-in itself.  DeVonish v. Keane, 19 F.3d 107, 109 (2d. Cir. 1994) citing Mackey, 49 N.Y.2d  at 280 and People v. Gilligan, 42 N.Y.2d 969 (1977).  Thus, the petitioner has failed to establish, as he must to obtain federal habeas relief, that the failure to specify the particular crime underlying the burglary predicate to a felony murder charge was required by clearly established federal law.

In light of the above, Stubbs' conviction was not repugnant.  The failure of both trial counsel and appellate counsel to advance such a claim does not constitute ineffective assistance of counsel.

**Conclusion**

Based on the above, the petition for habeas corpus relief is denied.  The Clerk of the Court is directed to close this case.

The Court also finds that no certificate of appealability should issue here, since petitioner

11

has not made a substantial showing of the denial of a constitutional right. *See,* 28 U.S.C. § 2253(c)(2) (Providing, in relevant part, that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also,* Miller-El v. Cockrell*,* 123 S.Ct. 1029, 1039-1042 (2003) ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (citation and internal quotation marks omitted).

     So Ordered.

                              s/Hon. Hugh B. Scott
                              United States Magistrate Judge

Buffalo, New York
September 28, 2005